NICOLA T. HANNA
United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
GREGORY W. STAPLES (Cal. Bar No. 155505)
BENJAMIN D. LICHTMAN (Cal. Bar No. 241135)
BRADLEY E. MARRETT (Cal. Bar No. 288079)
Assistant United States Attorneys
    Ronald Reagan Federal Bldg. & U.S. Courthouse
    411 West 4th Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3535/3505
    Facsimile: (714) 338-3708/3561
    E-mail:   greg.staples@usdoj.gov
                benjamin.lichtman@usdoj.gov
                bradley.marrett@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>GILBERT N. MICHAELS, et al.,<br><br>        Defendants. | No. SA CR 16-00076-JVS<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT LEAH JOHNSON<br><br>Date: October 26, 2020<br>Time: 9:00 a.m. |

The government submits its sentencing position for defendant Leah Johnson.

Dated: October 5, 2020          /s/
                                    GREGORY W. STAPLES
                                    BENJAMIN D. LICHTMAN
                                    BRADLEY E. MARRETT
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

## I. INTRODUCTION

The government has no objections to the findings in the PSR. For the reasons discussed below, the government recommends a sentence of 57 months of imprisonment and three years of supervised release. The government believes restitution is impractical in this case and therefore does not recommend an order for restitution.

## II. BACKGROUND

After a six-week trial, the jury convicted defendant Johnson of Count One of the Indictment, conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and Count Fourteen, mail fraud, in violation of 18 U.S.C. § 1341.

With co-defendant John Buzzard, Johnson owned and operated LJT Distribution, Inc. dba Capital Supply Center during the time of her counts of conviction. Johnson signed a service agreement with IDC Servco in 2009. PSR ¶ 68. The substantive mail fraud count she was convicted of occurred in May 2012. PSR ¶ 70.

From January 1, 2010, through August 21, 2014, LJT Distribution deposited checks totaling $1,642,032.53 that it received from GNM Financial Services, Inc., for sales of toner made by Capital Supply Center and shipped by GNM. See Declaration of Carlene Kikugawa, filed concurrently, at ¶ 2(d). As established at trial, GNM handled the billing and shipping of the toner. It paid the cost of the toner, and deducted that cost, as well as costs for returns, chargebacks, money held by GNM in reserve, and GNM's fee, from the proceeds of the sales it paid to the sales companies. See RT 11/1/19, 47: 6-13; 73: 1-12; Kikugawa Decl., ¶ 2.

The price GNM charged the sales companies for the toner it shipped was at or above the retail price. See RT 11/1/16: 75, 187. The prices charged to the victims in this case, many of whom were already receiving toner at no additional charge pursuant to contracts for their copiers and printers, was far above the retail price. RT 11/8/19: 111-14.

Therefore, for purposes of a loss estimate, the money sent by GNM to the sales rooms represents the loss to victims, if the value of the product the victims received is taken into account. The money the sales rooms received represents the cost of the toner above its retail value that victims were duped into paying.

III. **GUIDELINES CALCULATIONS**

The government[1] calculates the Sentencing Guidelines as follows:

| | | |
|---|---|---|
| Base offense level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss > $1.5 million: | 16 | U.S.S.G. § 2B1.1(b)(1)(I) |
| Mass marketing: | 2 | U.S.S.G. § 2B1.1(b)(2)(A)(ii) |
| Total offense level: | 25 | |

Probation has determined that defendant is in criminal history category I. The resulting sentencing range for an offense level 25 and criminal history category I is 57-71 months. In addition, defendant is subject to an additional five years in prison because the crime involved telemarketing. 18 U.S.C. § 2326. For the reasons discussed below, the government believes a sentence of 57 months satisfies the sentencing goals of 18 U.S.C. § 3353.

---

[1] The Probation Office did not have the government's loss estimates at the time the PSRs were filed. The government produced the estimates to Probation and defense counsel on October 1, 2020, once it had determined a reasonable approach to the loss calculations in this case.

The government's loss estimate is based on a four-year period from January 2010 to August 2014. This was the period for which the government had bank records for GNM and the sales companies at the time of the indictment. The government used this time period as the basis for loss estimates for the defendants who pleaded guilty. It does not represent the length of the whole scheme. With respect to defendant Johnson, she signed a service agreement with IDC Servco in 2009, and, with co-defendant Buzzard, operated LJT Distribution since 2000. PSR ¶¶ 68, 123. Thus, the government's loss estimate captures only of fraction of sales made by defendant and her company.

The loss estimate also does not capture the full amount of loss to the victims. The amount of money GNM paid to the sales companies is not the amount of money the victims paid. GNM deducted the cost of the toner – at retail rates or more – and held back money in reserve for future returns and chargebacks, as well as its own fees it charged the sales rooms for fulfillment and shipping.

Thus, the government's loss estimate undercounts actual loss because it does not capture all the sales, or the full loss to the victims. Nonetheless, the government's loss figure does provide the Court with a reasonable estimate for a portion of the scheme, and does, in the government's view, result in a sentence that comports with the § 3553 factors. It is not possible to precisely determine loss in this case, which spanned decades and involved thousands of victims. It is for this reason the government also does not believe restitution is practical in this case.

**IV. SECTION 3553 FACTORS**

While fraud in the individual sale of toner may not seem significant, in the aggregate its impact is a serious drain on the resources of small businesses and non-profits that are targeted. At a March 2000 hearing of the Senate Committee on Small Businesses, the committee chairman opened the session as follows:

> Last fall this Committee commenced a series of hearings on deceptive or unfair trade practices that are particularly harmful to the small business community . . . This morning we will address another scam targeting small businesses; the fraudulent telemarketing of office supplies, particularly copier and printer toner. While the fraudulent telemarketing of toner cartridges may at first glance seem to be "no big deal," I am here to tell you that it is actually an extraordinarily widespread problem, and to be this high on our agenda it has to be. The Committee has received estimates that this type of fraud victimizes businesses up to $250 million per year.

See S. Hrg. 106-516, filed concurrently as Exhibit 8, at p. 3.

The chairman went on to describe how the fraud worked: the telemarketers "will expressly or implicitly represent that they are associated with the business' regular supplier," and that there has been, or is about to be, a price increase for toner. Id. The chairman referenced aggressive collection techniques and "reloading" – jamming sales through to a willing buyer until the scam is discovered – conduct identical to this case. Id.

The nature and circumstances of the offense, and the history and characteristics of the defendant, support a 57-month sentence.

Defendant signed a service agreement in which she was told she and her employees could not tell customers they were associated with the customer's regular supplier or there had been a price increase, and by signing the agreement she agreed not to do so. She received a copy of the FTC's consent decree prohibiting the very practices for which she is now convicted. In addition, defendant was the subject of victim complaints that she and her employees were engaging in fraud. Her partner John Buzzard testified that he discussed the complaint from Tawas Realty in Michigan, the victim in Count Fourteen, with Johnson, and that they did not want to issue a refund. RT 11/5/19: 71-72. Yet she continued unabated.

Given the way the defendant flouted the FTC judgment and others, a 57-month sentence represents a just punishment, promotes respect for the law, and may deter others inclined to defraud small businesses and non-profits. As a result of the convictions in this case, the U.S. Attorney's Office has received a complaint concerning a toner scam currently operating in this District. For too long defendants have acted with impunity in conducting their fraud, viewing civil suits as merely a cost of doing business.

Finally, a 57-month sentence is no greater than necessary to achieve the goals of § 3553 because it actually undercounts the actual losses in this case.

**V.    CONCLUSION**

For the foregoing reasons, the Court should impose a sentence of 57 months, in addition to the other terms and conditions recommended by Probation.